**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

CHRISTINE YONEMURA, derivatively on behalf of
NORTHWEST BIOTHERAPEUTICS, INC.,

    1270 Avenue of the Americas
    New York, New York 10020

            Plaintiff,

    vs.

LINDA F. POWERS,

    9306 Kendale Road
    Potomac, Maryland 20854
    Montgomery County

ALTON L. BOYNTON,

    5339 SW Tumbleweed Road
    Andover, Kansas 67002
    Butler County

ROBERT A. FARMER,

    1800 NE 114th Street
    Miami, Florida 33181
    Miami-Dade County

NAVID MALIK,

    c/o Northwest Biotherapeutics, Inc.
    4800 Montgomery Lane, Suite 800
    Bethesda, Maryland 20814
    Montgomery County

JERRY JASINOWSKI,

    3228 Rittenhouse Street NW
    Washington, D.C. 20015

Civil Action No. 8:15-cv-3526

**VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

TOUCAN CAPITAL FUND III, L.P., a Delaware
Limited Partnership,

      4800 Montgomery Lane, Suite 800
      Bethesda, Maryland 20814
      Montgomery County

TOUCAN GENERAL II, LLC, a  Delaware Limited
Liability Company,

      4800 Montgomery Lane, Suite 800
      Bethesda, Maryland 20814
      Montgomery County

TOUCAN PARTNERS, LLC, a Delaware Limited
Liability Company,

      4800 Montgomery Lane, Suite 801
      Bethesda, Maryland 20814
      Montgomery County

COGNATE BIOSERVICES, INC., a Delaware
Corporation,

      7513 Connelly Drive
      Hanover, Maryland 21076
      Anne Arundel County

      -and-

NORTHWEST BIOTHERAPEUTICS, INC., a Delaware
Corporation,

      4800 Montgomery Lane, Suite 800
      Bethesda, Maryland 20814
      Montgomery County

               Defendants.

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

THE PARTIES.................................................................................................................... 3

SUBSTANTIVE ALLEGATIONS ..................................................................................... 7

   *A.*  *Powers' Control of Northwest Bio and Cognate* ............................................... 7

   *B.*  *Northwest Bio's Related-Party Transactions with the Toucan Entities* ............ 8

   *C.*  *Northwest Bio's Related-Party Transactions with Cognate* ............................ 12

     The Prior Service Agreements.................................................................... 12

     The 2011 Conversion Agreement .............................................................. 13

     The 2012 Conversion Agreement .............................................................. 14

     The 2013 Conversion Agreement .............................................................. 14

     The Cognate Notes .................................................................................... 15

   *E.*  *Powers Has Benefitted Personally from the Related-Party Transactions*........ 16

   *F.*  *The Board's Review of the Related-Party Transactions Was Not Independent* ............... 17

DERIVATIVE AND DEMAND ALLEGATIONS ........................................................... 17

COUNT I ......................................................................................................................... 18

COUNT II ........................................................................................................................ 19

COUNT III........................................................................................................................ 19

PRAYER FOR RELIEF ................................................................................................... 20

JURY TRIAL DEMAND ................................................................................................. 21

Plaintiff Christine Yonemura ("Plaintiff"), by her undersigned attorneys, for this Verified Stockholder Derivative Complaint against the defendants, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      Plaintiff asserts derivatively on behalf of Northwest Biotherapeutics, Inc. ("Northwest Bio" or the "Company") claims for breach of fiduciary duties against the current members of the Company's Board of Directors (the "Board") in connection with the Board's decision to enter into related party transactions, including manufacturing and services agreements, with Cognate BioServices, Inc. ("Cognate"), an entity controlled by Linda Powers ("Powers"), Northwest Bio's controlling stockholder, Chief Executive Officer, President, Principal Financial Officer, and Chairperson of the Board, individually and through a number of related entities. These related entities are Toucan Capital Fund III, L.P. ("Toucan Capital"), Toucan Partners, LLC ("Toucan Partners"), Toucan Partners, LP ("Toucan Partners, LP") and Toucan General II, LLC ("Toucan General") (collectively referred to as the "Toucan Entities.")  Similarly, Plaintiff asserts claims derivatively against Powers, Cognate, and Toucan Capital for aiding and abetting the breaches of fiduciary duties relating to the related party transactions between Cognate and the Company alleged herein.  Plaintiff further asserts claims derivatively of unjust enrichment against Powers, Cognate, and Toucan Capital as a result of the substantial amounts of cash siphoned from the Company through the excessive and unwarranted payments under the various agreements with Cognate.

2.      Since at least 2004, Northwest Bio has entered into services agreements with Cognate, a contract bioservices organization controlled by Powers, which provided development

and manufacturing services to institutions and companies that develop cell-based products. Pursuant to these agreements, Cognate purportedly provided the Company with advisory, manufacturing, and research services in connection with the development and production of the Company's platform technology, DCVax®, and products thereunder.  The Company has paid Cognate tens of millions of dollars in fees, most of which has been in the form of Northwest Bio common stock at conversion rates which benefited Powers, Cognate, and Toucan Capital to the detriment of the Company.  In 2013 alone, Northwest Bio paid Cognate over $17.6 million above what they actually owed.  The fees paid to Cognate are unfair and unjustifiable and its arrangements with the Company were structured with the purpose of ensuring that Powers maintains her status as the Company's controlling stockholder.

3.      A group of allegedly independent directors purportedly reviews all agreements between the Company and Cognate.  Yet, given the inherently unfair terms of these transactions, this self-proclaimed group of independent directors is nothing more than an extension of Powers serving to "rubber-stamp" whatever deal she places before it.  At no time has the Company sought independent fairness opinions or legal or financial advice as to the numerous transactions entered into between Northwest Bio and other entities under Powers' control.

4.      Plaintiff confirmed as much through her books and records inspection.  By letter dated November 6, 2014 (the "220 Demand"), Plaintiff demanded to inspect the Company's books and records pursuant to 8 *Del. C.* § 220.  In turn, Plaintiff received a number of documents from the Company.

5.      Defendant Powers' control over Northwest Bio's dealings with Cognate is apparent. These practices have persisted unabated, continuing to harm the Company. In addition to all of the related party transactions discussed in detail below, Cognate recently reported on a

2

Form 4 that it had agreed to settle a debt Cognate owed to a third party worth approximately $17.5 million with $8 million dollars of Northwest Bio stock. While the date of issuance of $3 million of the debt is undisclosed, two $2.5 million convertible loans totaling $5 million entered into by Cognate in June and July 2014 were repaid with Northwest Bio shares worth $11.1 million. Thus, in less than one year this undisclosed investor was able to more than double its profit. As explained more in detail below, these terms were well below those available and came at the expense of the Company.

6.      Northwest Bio's Board is comprised of directors who are neither independent nor disinterested, and therefore incapable of considering the related party transactions properly under Delaware law. Further, since Powers' transactions with Cognate constitute related party transactions, the burden is on the Board to show the transactions were entirely fair. Plaintiff brings this action to recover any and all damages caused by the foregoing excessive payments and improper related party transactions, and to compel Powers, Cognate, and Toucan Capital to disgorge the excessive payments and/or benefits received in connection therewith.

## THE PARTIES

7.      Plaintiff is, and has been at all times since July 2007, the owner of shares of common stock of Northwest Bio.

8.      Defendant Northwest Bio is a Delaware corporation with its principal place of business at 4800 Montgomery Lane, Suite 800, Bethesda, Maryland 20814. Northwest Bio is a publically traded development stage biotechnology company that develops immunotherapy products to treat cancers through its proprietary batch manufacturing process. The Company has developed a platform technology, DCVax®, which employs activated dendritic cells to mobilize a patient's own immune system to attack their cancer. DCVax® is used in several of the

3

Company's product lines including the DCVax®-L line, for surgically-removable solid cancer tumors, and the DCVax®-Direct line, for solid cancer tumors which are inoperable or unable to be surgically removed.  As of February 28, 2015, the Company had 12 full-time employees with some additional manufacturing-related employees in Germany.

9.      Defendant Powers serves as the Company's Chief Executive Officer ("CEO"), President, Principal Financial and Accounting Officer, and Chairperson of the Board.  Powers has served as the Board's Chairperson since May 17, 2007 and as the CEO since June 8, 2011.  Powers is the beneficial owner of a majority of the Company's stock, controls the outcome of all issues that require a stockholder vote, and can control the Company's policies and operations.  Powers has been and continues to be a major shareholder of Northwest Bio.  Since 2004. Powers has owned between 44-86% of the Company.  Powers beneficially owns her Northwest Bio common stock through a complex structure of controlled and/or wholly-owned entities.  As explained in the Company's Schedule 14A filed November 6, 2015 ("2015 Proxy"), Powers' ownership consists of a number of shares owned individually as well as through the Toucan Entities and Cognate. (2015 Proxy, pp. 8-9).

10.     Defendants Toucan Partners, Toucan General, and Toucan Capital are owned and/or controlled by Powers.  Northwest Bio's 2015 Proxy confirms that Powers possesses "voting and dispositive power over the securities owned by the Toucan entities and [Defendant Cognate]." (2015 Proxy, pp. 8-9).  Toucan Capital's general partner is Toucan General, for which Powers serves as the managing director.  Toucan Partners' managing member is Powers.  Toucan Capital is a Delaware limited partnership.  Toucan General and Toucan Partners are Delaware limited liability companies.  Toucan Partners maintains offices at 4800 Montgomery Lane, Suite 801,

Bethesda, Maryland 20814.   Toucan Capital and Toucan General maintain offices at 4800 Montgomery Lane, Suite 800, Bethesda, Maryland 20814.

11.     Defendant Cognate is a fully-integrated contract bioservices organization which provides development and cGMP manufacturing services to institutions and companies that develop cell-based products.   Cognate is an entity beneficially controlled by Northwest Bio's controlling stockholder, President, CEO, and Chairperson Powers.   Defendant Toucan Capital is the principal shareholder of Cognate (not including Cognate's employee pool).   Cognate is a Delaware corporation with its corporate headquarters located at 7513 Connelley Drive, Hanover, Maryland 21076.

12.     Defendant Alton L. Boynton, Ph.D. ("Boynton") co-founded the Company. Boynton has served as the Company's Chief Scientific Officer ("CSO") and as a Director since the Company's inception in 1998.   Boynton has also served as the Company's Chief Operating Officer ("COO") and President.   Boynton previously served as the Company's CEO between June 2007 and June 2011.   As disclosed by the Company in the 2015 Proxy (p. 9), Boynton is not considered independent pursuant to NASDAQ Marketplace Rules.

13.     Defendant Robert A. Farmer ("Farmer") has been a director of the Company since December 2009.   Farmer serves on the Board's Audit Committee and on the Board's Compensation Committee and Nominations Committee.

14.     Defendant Jerry Jasinowski ("Jasinowski") has been a director of the Company since his appointment on April 16, 2012.   Jasinowski serves on the Board's Audit Committee and on the Board's Compensation Committee and Nominations Committee.

15.     Defendant Navid Malik ("Malik") has been a director of the Company since his appointment on April 16, 2012.  Malik serves on the Board's Audit Committee and on the Board's Compensation Committee and Nominations Committee.

16.     All references to the "Board" herein refer to the members of the Board then in office at the time the alleged facts occurred.

17.     Defendants Powers, Boynton, Farmer, Malik and Jasinowski are collectively referred to as the "Director Defendants."

## JURISDICTION AND VENUE

18.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity between Plaintiff and Defendants, and the amount in controversy exceeds $75,000.

19.     This Court has jurisdiction over each Defendant because each defendant is either a corporation that does sufficient business in Maryland, or is an individual who has sufficient minimum contacts with Maryland so as to render the exercise of jurisdiction by the Maryland courts permissible under traditional notions of fair play and substantial justice.  This action is not a collusive one to confer jurisdiction on this Court which it would not otherwise have.

20.     Venue is proper in this Court pursuant to 28 U.S.C § 1391 because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## SUBSTANTIVE ALLEGATIONS

**A.**     ***Powers' Control of Northwest Bio and Cognate***

21.     Powers is the Company's Chief Executive Officer ("CEO"), President, Principal Financial and Accounting Officer, and Chairperson of the Board.  Powers has served as the Board's Chairperson since May 17, 2007 and as the CEO since June 8, 2011.

22.     From at least 2004, Powers has possessed control over Northwest Bio.  The following chart indicates Powers' stock ownership over the past several years:

| Date | Number of Shares Beneficially Owned | Percentage |
|---|---|---|
| October 27, 2015 | 49,329,300 | 44.88% |
| September 30, 2014 | 39,202,623 | 50.67% |
| February 28, 2014 | 32,812,351 | 50.21% |
| October 31, 2013 | 21,334,324 | 51.35% |
| July 30, 2012 | 120,558,957 | 55.9% |
| April 9, 2012 | 110,720,111 | 56.11% |
| March 31, 2011 | 48,812,559 | 44.7% |
| July 20, 2009 | 52,872,326 | 69.5% |
| April 13, 2009 | 65,279,856 | 69.7% |
| April 21, 2008 | 52,739,826 | 72% |
| December 5, 2007 | 52,762,495 | 72% |
| April 19, 2007 | 360,674,520* | 84.7% |
| April 20, 2006 | 394,602,241* | 86% |

\* – Beneficial ownership of shares by Toucan Capital Fund II, L.P. and/or associated entities.  Toucan Capital Fund II, L.P., which is currently dissolved, was managed by Powers from 2001 through 2010.

23.     Powers has a significant ownership stake in Northwest Bio and has the ability to exert control over its operations beyond her executive roles through her beneficial control of the Company and her ownership, management and director roles.  The Company has repeatedly admitted as much: since at least April 15, 2004, the Company has stated in each of its annual reports filed with the SEC (Form 10-K) indicating that Powers (through her various entities and affiliates) "[has] the ability to exert substantial influence over all matters requiring approval by [the Company's] stockholders . . . ."

**B.      *Northwest Bio's Related-Party Transactions with the Toucan Entities***

24.     Predating the Company's transactions with Cognate (discussed below), Powers was benefitting personally from a number of transactions between the Company and a group of controlled and/or wholly-owned entities referred to as the "Toucan Entities."  The Toucan Entities include the vehicles through which Powers beneficially owns her Northwest Bio common stock (*i.e.*, Toucan Capital and Toucan Partners, LLC) as well as a number of other related entities and/or affiliates (*i.e.*, Toucan Management, LLC, Toucan General II, LLC, and Toucan Capital Fund II, L.P.).  Generally, the Toucan Entities are venture capital entities controlled by Powers, which have provided substantial amounts of financing to fund the Company's operations since 2004.  As a result of these financing transactions with the Toucan Entities, Powers has gained and maintained a significant ownership and control stake in the Company.

25.     In February 2004 when the Company began a significant recapitalization through a series of private placements to the Toucan Entities, despite the availability of financing arrangements from unrelated third parties on better terms.

26. These financings and capital raising transactions between the Toucan Entities and the Company between February 2004 and May 25, 2007 included the issuance of convertible promissory notes, preferred stock, and warrants in exchange for approximately $12.8 million in capital.

27. Subsequent to these initial recapitalization transactions, the Toucan Entities continued to provide financing and additional support to the Company, including, but not limited to, subleasing the Company space for its headquarters, paying certain expenses on behalf of the Company, providing short-term loans, and providing an equity facility.

28. The Company continued to enter into agreements and conduct multiple transactions with Toucan Entities between 2008 and 2012. These transactions with the Toucan Entities included loans, conversions of the Company's debt into equity, and the formation of an equity facility. Some of the representative transactions which occurred during this timeframe include:

    a. On December 22, 2008, Toucan Partners loaned $500,000 to the Company with a term of six months at 12% interest. Additionally, in conjunction with the loan, the Company issued Toucan Partners warrants to purchase shares of the Company's common stock;

    b. On August 19, 2008, Toucan Partners loaned $1.0 million to the Company. On September 28, 2009, the $1,156,718 balance due under the loan was converted to 361,474[1] shares of the Company's common stock using a conversion rate of $3.20 per share. The Company's closing stock price on the date of the conversion was $12;

    c. On July 2, 2010, the Company entered into a securities purchase agreement whereby Toucan Partners purchased 54,167 shares of the Company's common stock for $650,000 and issued warrants to the Company to purchase an additional 86,667 shares at an exercise price of $12. The Company's closing

---

[1] On September 26, 2012, Northwest Bio issued a 1 for 16 reverse split, meaning for each 16 shares of Northwest Bio stock owned pre-split, the shareholder now owned 1 share. For example, a 1,000 share position pre-split became a 62.5 share position following the split. For consistency and ease, all share amounts, stock prices, and conversion prices in the Complaint have been converted to reflect post-split prices and amounts.

stock price on the date of the conversion was $10.88.  Just 5 days later, the stock closed at $21.60;

d.  On October 1, 2010, the Company received a $900,000 convertible loan from Toucan Partners to repay a portion of an outstanding loan payable to a third party.  Under the terms of the agreement, Toucan Partners could convert the principal into shares of the Company's common stock at $12 per share.  As part of the agreement, Toucan Partners also received 100% warrant coverage with an exercise price of $13.12.  The Company's closing price on the date of the agreement was $12.48;

e.  In March 2011, the Company issued a convertible note to Toucan Partners in exchange for $500,000.  The conversion price of the note was approximately 80% of the average closing price of Northwest Bio's stock for the 25-day preceding the conversion.  In October 2011, the note was converted into just over 125,000 shares of common stock;

f.  On June 2, 2011, the Company entered into an agreement with Toucan Partners to create an equity facility pursuant to which the Company would issue registered shares of the Company's common stock to provide potential financing of up to $25 million over a 30-month period (the "Credit Facility").  The Credit Facility obligated Toucan Partners to purchase shares of the Company's stock upon a sales notice issued to Toucan Partners at a price equal to 95% of the three lowest closing bid prices of the Company's common stock during the fifteen trading days prior to the date of the notification to Toucan Partners.  Additionally, the Company was obligated to pay all expenses related to the equity facility and pay Toucan a 1% commitment fee upon the execution of the Credit Facility agreement and a 5% fee on the sales of all shares under the facility;

g.  On November 1, 2011, Toucan Partners converted $150,000 of a note payable into a 46,875 shares of the Company's common stock.  This is a conversion rate of $3.20 per share.  The Company's closing price on the date of conversion was $8.00;

h.  On December 29, 2011, Northwest Bio entered into a convertible loan agreement with Toucan Partners for an amount of $100,000 and issued warrants to purchase 15,625 shares of Northwest Bio common stock at $6.40 per share.  The Company's closing price on the date of the agreement was $6.08 per share;

i.  On January 3, 2012, Northwest Bio entered into a convertible loan agreement with Toucan Partners for an amount of $80,000 and issued warrants to purchase 25,000 shares of Northwest Bio common stock at $3.20 per share.  The Company's closing price on the date of the agreement was $6.40;

j.  On January 31, 2012, Northwest Bio entered into a convertible loan agreement with Toucan Partners for an amount of $425,000 and issued warrants to

purchase 132,813 shares of Northwest Bio common stock at $3.20 per share. The Company's closing price on the date of the agreement was $5.92;

k.      On February 9, 2012, Northwest Bio entered into a convertible loan agreement with Toucan Partners for an amount of $1,500,000 and issued warrants to purchase 468,750 shares of Northwest Bio common stock at $3.20 per share. The Company's closing price on the date of the agreement was $5.76;

l.      On March 2, 2012, Northwest Bio entered into a convertible loan agreement with Toucan Partners for an amount of $250,000 and issued warrants to purchase 78,125 shares of Northwest Bio common stock at $3.20 per share. The Company's closing price on the date of the agreement was $5.12;

m.      On March 6, 2012, Northwest Bio entered into a convertible loan agreement with Toucan Partners for an amount of $500,000 and issued warrants to purchase 78,125 shares of Northwest Bio common stock at $6.40 per share. The Company's closing price on the date of the agreement was $5.12;

n.      On October 16, 2012, Northwest Bio converted approximately $10.7 million of Toucan Partners' convertible notes and payables into 3.6 million shares of restricted common stock and 1.8 million warrants with an exercise price of $3.20 per share.  The excess $1.9 million Toucan received in the conversion was recorded as a conversion inducement expense. The Company's closing price on the date of the agreement was $6.10; and

o.      In November 2012, Northwest Bio decided to reimburse the Toucan Entities for $4.6 million in the form of Company stock for operation expenses previously incurred.  The reimbursement totaled approximately 1.7 million shares of common stock and 800,000 warrants.  According to the Company's 10-Q filed on November 14, 2012, the Company recognized the fair value of the common stock and warrants, to the extent that they were in excess of the $4.6 million of accrued expenses, as a charge to operations.  The Company recorded a charge of $7.346 million to general and administrative operation expenses for the third quarter of 2012.

29.      These transactions were on terms favorable to the Toucan Entities and on terms less favorable to the Company than terms available from other, non-related third parties.

30.      During this time, the Company was dominated by Powers and the relevant Toucan Entities both at the Board level and at the stockholder level.

31.     In fact, the Company disclosed in its Form 10-K filed with the SEC on April 13, 2012, as part of its *Management's Report on Internal Controls Over Financial Reporting*, that one of the material weaknesses identified by management was the:

> Lack of a sufficient number of independent directors for our board and audit committee. We currently only have one independent director on our board, which is comprised of three directors, and on our audit committee. Although we are considered a controlled company, whereby a group holds more than 50% of the voting power, and as such are not required to have a majority of our board of directors be independent.

32.     Towards the end of 2012, the frequency of the financing transactions between the Company and the Toucan Entities began to slow.  However, this slowing was not due to a change in conduct on the part of Powers.  Rather, Powers began to give preference to the manufacturing agreements between the Company and Cognate as the primary vehicle for protecting her ownership and control stake in the Company.

**C.      Northwest Bio's Related-Party Transactions with Cognate**

33.     Since July 2004, Cognate has been providing manufacturing and other services to the Company related to its DCVax® products and has received substantial payments in the form of the Company's common stock for such services.  These payments in common stock have allowed Powers to maintain her ownership and control over the Company to the detriment of the minority stockholders.

<u>The Prior Service Agreements</u>

34.     On July 30, 2004, the Company entered into the first of these agreements, a two-year services contract with Cognate for, among other things, the manufacturing of the Company's DCVax® product candidates, research, and regulatory advice ("2004 Services Agreement").

35.     On May 17, 2007, the Company entered into the second of these services agreement with Cognate for consulting and manufacturing services concerning the Company's DCVax®-Brain Phase II clinical trial ("2007 Services Agreement").

36.     On the same day the Company entered into the 2007 Services Agreement, Powers was appointed as the Chairperson of the Board.

37.     Nearly four years later, on April 1, 2011, the Company entered into another services agreement with Cognate for manufacturing, storage, and shipping services related to the Company's DCVax® products (the "2011 Services Agreement").

38.     Under each of the agreements, the Company has incurred a substantial amount of expenses.  The Company has disclosed that under the services agreements with Cognate "[d]uring the years ending December 31, 2006, 2007 and 2008, respectively that Northwest Bio recognized approximately $2.4 million, $5.8 million and $7.8 million of research and development costs related to its service agreements."   Furthermore, the Company also disclosed substantial research and development costs under the 2011 Services Agreement amounting to approximately $16.5 million in 2012 and $24.5 million in 2013.  These amounts appear to be above market price and favorable to Cognate and Powers.

39.     In addition to the Prior Service Agreements, even though the Company had the ability to raise money to pay cash, the Company began to convert Cognate's outstanding debt into equity, offering conversion rates that were substantially lower than the market price per share of Northwest Bio's stock.

### The 2011 Conversion Agreement

40.     On November 25, 2011, Northwest Bio agreed to convert $9.8 million of debt owed to Cognate into 2.875 million shares of the Company's common stock (the "2011 Conversion

Agreement") at a rate of $3.36 per share.  Northwest Bio's stock price on November 25, 2011 was $5.76 per share.

## The 2012 Conversion Agreement

41.     On October 16, 2012, Northwest Bio agreed yet again to convert another $7.5 million of debt owed to Cognate into 2.8 million shares of the Company's common stock and 1.4 million warrants (the "2012 Conversion Agreement"). The 2012 Conversion agreement resulted in a conversion rate of $3.20.  Northwest Bio's stock price on October 16, 2012 was $6.10 per share, almost twice the conversion rate enjoyed by Cognate.  Northwest Bio filed a registration statement with the SEC on December 10, 2012 with warrants priced at $5.00.  According to the Company's 10-K, the difference between the fair value of the shares of common stock and warrants issued in excess of the carrying amount of the liabilities amounted to $3.1 million.

## The 2013 Conversion Agreement

42.     On July 30, 2013, Northwest Bio agreed to convert $11.6 million of Cognate's accounts payable into 2.9 million shares of the Company's common stock at conversion rate of $4.00 per share ("2013 Conversion Agreement").  Pursuant to the 2013 Conversion Agreement, the Company and Cognate further agreed that starting in August 2013 that the Company would pay in perpetuity at least half of all invoices due to Cognate in shares of the Company's common stock at a conversion price of $4.00 per share until the agreement was terminated by mutual agreement. On July 30, 2013, the Company's closing stock price was $7.36.

43.     Cognate was also compensated for agreeing to a lock up provision in the 2013 Conversion Agreement preventing Cognate from selling any conversion shares to a party other than an affiliate for a period of eighteen (18) months.

44.     Additionally, to protect the Powers' interests during the effective time of the agreement, the 2013 Conversion Agreement contains an anti-dilution provision, referred to as a

14

"most favored nation provision", where Cognate (and, in turn, Powers) will receive terms at least as favorable as provided to any other investor or creditor, including with respect to any warrants.

45.     In addition to the unfair conversion terms stated, Powers caused Northwest Bio to engage in a number of other related party transactions with Cognate.

<u>The Cognate Notes</u>

46.     Cognate loaned the Company $2.25 million in June 2014.  On June 30, 2014, the Company converted all $2.25 million in exchange for 562,500 shares and 281,500 warrants at an exercise price of $4.00.  Northwest Bio stock closed at $6.76 per share on June 27, 2014 (the last full trading day preceding the conversion), meaning that the conversion was at an approximate 40% discount to the market price.  Moreover, the terms of the conversion were drastically different than those provided in Northwest Bio's offering on April 11, 2014 (the "April 2014 Offering"), where Northwest Bio sold over 2.2 million shares at $6.60 per share, a 3% premium to the then-current market price of Northwest Bio stock.

47.     Additionally, on October 22, 2015, Cognate loaned the Company $1 million pursuant to a Demand Promissory Note (the "Cognate Note").  The Cognate Note bears interest at the rate of 8% per annum, and will be payable upon demand, with 7 days' prior written notice by Cognate to the Company. The Cognate Note also bears (i) 35% warrant coverage on the principal amount and interest amount (collectively, the "Repayment Amount"), if the Cognate Note is repaid in full on or before the expiration of 30 calendar days following the date hereof and (ii) 100% warrant coverage on the Repayment Amount, if the Cognate Note is not repaid in full within 31 calendar days of the date hereof.

**E.      *Powers Has Benefitted Personally from the Related-Party Transactions***

48.      The Company's transactions with Cognate reveal a pattern whereby Powers has successfully and routinely increased her ownership and control stake to offset any dilution she incurs from outside financing arrangements. For example:

a.      In April 2013, the Company entered into an agreement with a healthcare-dedicated institutional investor for a registered direct placement of approximately 2.564 million shares.  As part of this transaction, the Company additionally issued to the investor warrants exercisable for 1,025,641 shares of common stock;

b.      On July 31, 2013, the Company and Cognate agreed to the 2013 Conversion Agreement whereby they agreed to convert an aggregate of $11.6 million in accounts payable into shares of the Company's common stock at a conversion price of $4.00 per share.  This resulted in the issuance in August 2013 and December 2013 of an aggregate of 4.7 million shares;

c.      On August 8, 2013, the Company entered into a securities purchase agreement with institutional investors for the sale of an aggregate of $15.0 million of units in a registered direct offering.  Each unit consisted of one share of common stock, one long-term warrant to purchase 0.25 of a share of common stock and one over-allotment warrant to purchase 0.25 of a share of common stock. Pursuant to this agreement, the Company issued to the investors 4,477,612 shares of common stock and long-term warrants exercisable for 1,119,403 shares and over-allotment warrants exercisable for 1,119,403 shares of common stock;

49.      The success of Powers' strategy is evident.  Despite engaging in a number of outside financing transactions and the issuance of shares to unrelated third parties, Powers has been able to maintain her beneficial ownership the Company.  The resulting effect of the Company entering into agreements with Cognate is that Powers is able to maintain and/or increase her ownership stake and control over the Company in order to offset the dilutive effect of conversions and securities offerings with unrelated third parties.  Further, Powers is able to generate revenue for Cognate and herself by negotiating between Northwest Bio and Cognate for terms that are more favorable to Cognate.

*F.*     ***The Board's Review of the Related-Party Transactions Was Not Independent***

50.     According to Northwest Bio's filings with the SEC, the Company's Board reviews related-party transactions for "potential conflicts of interests or other improprieties."  For example, Northwest Bio's 2013 Form 10-K states:

> With respect to reviewing and approving related-party transactions, the Board reviews related-party transactions for potential conflicts of interests or other improprieties. Under SEC rules, related-party transactions are those transactions to which we are or may be a party in which the amount involved exceeds the lesser of $120,000 or one percent of the average of our total assets at year end for the last two completed fiscal years, and in which any of our directors or executive officers or any other related person had or will have a direct or indirect material interest, excluding, among other things, compensation arrangements with respect to employment or board membership. Any transactions with officers, directors or 5% stockholders are on market-based terms, and are approved by a majority of our independent and disinterested directors.

51.     Despite the volume and frequency by which the Company does business with related entities, related party transactions are not reviewed by a special committee or other committee of independent directors.

## DERIVATIVE AND DEMAND ALLEGATIONS

52.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

53.     Plaintiff brings Counts I through III derivatively in the right and for the benefit of the Company to redress: (i) the Director Defendants' breaches of fiduciary duties; (ii) Cognate and Powers aiding and abetting the Director Defendants' breaches of fiduciary duties; and (iii) Cognate's and Powers' unjust enrichment.

54.     Plaintiff is a stockholder of Northwest Bio, was a stockholder of Northwest Bio at the time of the wrongdoing alleged herein, and has been a stockholder of Northwest Bio continuously since that time.

17

55.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

56.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

57.     On September 30, 2015, Plaintiff made a demand (the "Demand") on the Board to commence an action against certain directors and executive officers of the Company.

58.     The Demand informed the Board that if it did not respond within 30 days, the Plaintiff would commence a stockholder derivative action on behalf of the Company.

59.     The Board has had sufficient time to respond to the Demand, yet has failed to do so, which is not, and could not be in good faith.  Accordingly there is no impediment to Plaintiff commencing and prosecuting this action on behalf of the Company.

## COUNT I

### Derivatively Against the Director Defendants for Breach of Fiduciary Duties

60.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

61.     As alleged in detail herein, each of the Director Defendants had a fiduciary duty to, among other things, act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

62.     The Director Defendants breached their fiduciary duties of loyalty and good faith by approving and continuing various agreements between the Company and Cognate complained of herein, which were not, and could not have been, exercises of good faith business judgment. Rather, they were intended to, and did, unduly benefit Defendants Powers, Cognate, and Toucan Capital at the expense of the Company and were not entirely fair to the Company.

63.     As a direct and proximate result of the Director Defendants' breaches of fiduciary duties, the Company has sustained substantial damages, including, but not limited to, the excessive payments and benefits given to Cognate and by virtue of their beneficial ownership of Cognate and Powers.

## COUNT II

### Derivatively Against Powers, Toucan Capital, and Cognate for Aiding and Abetting

64.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

65.     As alleged in detail herein, each of the Director Defendants had a fiduciary duty to, among other things, act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

66.     The Director Defendants breached their fiduciary duties of loyalty and good faith by approving and continuing the agreements between the Company and Cognate complained of herein, which were not, and could not have been, exercises of good faith business judgment. Rather, they were intended to, and did, unduly benefit the Powers, Cognate, and Toucan Capital at the expense of the Company and were not entirely fair to the Company.

67.     As alleged in more detail above, Powers, Cognate, and Toucan Capital aided and abetted the Director Defendants' breaches of fiduciary duties by causing the Board to enter into the agreements with Cognate.

## COUNT III

### Derivatively Against the Powers, Toucan Capital, and Cognate for Unjust Enrichment

68.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

19

69.     As a direct and proximate result of the Director Defendants' breaches of fiduciary duties, Defendants Cognate and Powers have received excessive and unwarranted payments and benefits as a result of the agreements between the Company and Cognate.

70.     It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for Defendants Cognate and Powers to retain the excessive and unwarranted payments and benefits they have received.

71.     To remedy the alleged unjust enrichment, the Court should compel Powers, Cognate, and Toucan Capital to disgorge to the Company the excessive and unwarranted payments and benefits they have received.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Awarding the Company the amount of damages it sustained as a result of the Director Defendants' breaches of fiduciary duties and Cognate's, Powers', and Toucan Capital's aiding and abetting of those breaches of fiduciary duty;

B.     Compelling Defendants Cognate, Powers, and Toucan Capital to disgorge to the Company the benefits they have received as a result of the related-party transactions;

C.     Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

D.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial.

Dated: November 19, 2015          **LEVI & KORSINSKY, LLP**

By:    */s/ Nicholas Porritt* _____
Nicholas I. Porritt
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel: (202) 524-4290
Fax: (202) 363-2121
nporritt@zlk.com

*Attorney for Plaintiff*

4835-1800-2987, v. 1