**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

| | |
|---|---|
| CHRISTINE YONEMURA, derivatively on behalf of NORTHWEST BIOTHERAPEUTICS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> LINDA F. POWERS, et al, <br><br> Defendants. | Civil Action No. 8:15-cv-03526 <br><br> **SECOND AMENDED VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................... 1

THE PARTIES........................................................................................................................ 4

JURISDICTION AND VENUE ............................................................................................. 6

SUBSTANTIVE ALLEGATIONS ........................................................................................ 7

    A.   *Powers' Control of Northwest Bio and Cognate* ........................................................ 7

    B.   *Northwest Bio's Related-Party Transactions with the Toucan Entities* ............................ 8

    C.   *Northwest Bio's Related-Party Transactions with Cognate* ............................................. 12

        The Prior Service Agreements........................................................................................ 13

        The 2011 Conversion Agreement ................................................................................... 14

        The 2012 Conversion Agreement ................................................................................... 14

        The 2013 Conversion Agreement ................................................................................... 14

        The Cognate Agreements ................................................................................................ 15

        The Cognate Sale ............................................................................................................ 17

        Powers' Use of Northwest Bio Stock through Cognate .................................................. 18

        The Cognate Notes .......................................................................................................... 20

    D.   *The Terms of the Company's Agreements with Cognate Unfairly Benefit Cognate and Powers to the Detriment of the Company* ...................................................................... 21

        The Initiation Payments................................................................................................... 21

        The Milestone Payments ................................................................................................. 22

        The Lock-Up Agreement and the "Piggyback" Registration Rights................................ 22

        The Conversion Rate and Warrants................................................................................. 23

    E.   *A Comparison of Financing Arrangements with Parties Other than Cognate Demonstrates the Lack of Arm's Length Negotiations with Cognate Transactions* ................. 25

    F.   *Powers Has Benefitted Personally from the Related-Party Transactions*........................ 29

    G.   *The Board's Review of the Related-Party Transactions Was Not Independent* ............... 30

DERIVATIVE AND DEMAND ALLEGATIONS ................................................................ 35

COUNT I ............................................................................................................................... 36

COUNT II .............................................................................................................................. 37

COUNT III............................................................................................................................. 37

PRAYER FOR RELIEF ........................................................................................................ 38

JURY TRIAL DEMAND ...................................................................................................... 39

i

Plaintiff Christine Yonemura ("Plaintiff"), by her undersigned attorneys, for this Second Amended Verified Stockholder Derivative Complaint against the defendants, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

<u>**NATURE OF THE ACTION**</u>

1.      Plaintiff asserts derivatively on behalf of Northwest Biotherapeutics, Inc. ("Northwest Bio" or the "Company") claims for breach of fiduciary duties against the current members of the Company's Board of Directors (the "Board") in connection with the Board's decision to enter into related party transactions, including manufacturing and services agreements, with Cognate BioServices, Inc. ("Cognate"), an entity controlled by Linda Powers ("Powers"), Northwest Bio's controlling stockholder, Chief Executive Officer, President, Principal Financial Officer, and Chairperson of the Board, individually and through a number of related entities.  These related entities are Toucan Capital Fund III, L.P. ("Toucan Capital"), Toucan Partners, LLC ("Toucan Partners"), Toucan Partners, LP ("Toucan Partners, LP") and Toucan General II, LLC ("Toucan General") (collectively referred to as the "Toucan Entities.").  Similarly, Plaintiff asserts claims derivatively against Powers, Cognate, and Toucan Capital for aiding and abetting the breaches of fiduciary duties relating to the related party transactions between Cognate and the Company alleged herein.  Plaintiff further asserts claims derivatively of unjust enrichment against Powers, Cognate, and Toucan Capital as a result of the substantial amounts of cash siphoned from the Company through the excessive and unwarranted payments under the various agreements with Cognate.

2.      Since at least 2004, Northwest Bio has entered into services agreements with Cognate, a contract bioservices organization controlled by Powers, which provided development

and manufacturing services to institutions and companies that develop cell-based products. Pursuant to these agreements, Cognate purportedly provided the Company with advisory, manufacturing, and research services in connection with the development and production of the Company's platform technology, DCVax®, and products thereunder. The Company has paid Cognate tens of millions of dollars in fees, most of which has been in the form of Northwest Bio common stock at conversion rates which benefited Powers, Cognate, and Toucan Capital to the detriment of the Company. In 2013 alone, Northwest Bio paid Cognate over $17.6 million above what they actually owed. The fees paid to Cognate are unfair and unjustifiable and its arrangements with the Company were structured with the purpose of ensuring that Powers maintains her status as the Company's controlling stockholder.

3.      A group of allegedly independent directors purportedly reviews all agreements between the Company and Cognate. Yet, given the inherently unfair terms of these transactions, this self-proclaimed group of independent directors is nothing more than an extension of Powers serving to "rubber-stamp" whatever deal she places before it. At no time has the Company sought independent fairness opinions or legal or financial advice as to the numerous transactions entered into between Northwest Bio and other entities under Powers' control.

4.      Plaintiff confirmed as much through her books and records inspection. By letter dated November 6, 2014 (the "220 Demand"), Plaintiff demanded to inspect the Company's books and records pursuant to 8 *Del. C.* § 220. In turn, Plaintiff received a number of documents from the Company. These documents confirmed that Defendant Powers was present and participated in the review of every decision concerning negotiations with Cognate and the Toucan Entities. Despite being conflicted, Powers occasionally voted on related party transactions, including, decisions related to the negotiation of new manufacturing agreements with Cognate, and the terms

and consideration in the form of stock and warrants that would be granted to Cognate and the Toucan Entities in exchange for cancelling their existing debts with the Company.  The documents confirm no independent legal or financial advice, negotiations, or alternatives were presented.

5.     Defendant Powers' control over Northwest Bio's dealings with Cognate is apparent given that Powers was present and participated in every Board meeting that discussed transactions between the Company and Cognate and/or the Toucan Entities. These practices have persisted unabated, continuing to harm the Company. In addition to all of the related party transactions discussed in detail below, Cognate recently reported on a Form 4 that it had agreed to settle a debt Cognate owed to a third party worth approximately $17.5 million with $8 million dollars of Northwest Bio stock. While the date of issuance of $3 million of the debt is undisclosed, two $2.5 million convertible loans totaling $5 million entered into by Cognate in June and July 2014 were repaid with Northwest Bio shares worth $11.1 million. Thus, in less than one year this undisclosed investor was able to more than double its profit.  As explained more in detail below, these terms were well below those available and came at the expense of the Company.

6.     Northwest Bio's Board is comprised of directors who are neither independent nor disinterested, and therefore incapable of considering the related party transactions properly under Delaware law.  Further, since Powers' transactions with Cognate constitute related party transactions, the burden is on the Board to show the transactions were entirely fair.  Plaintiff brings this action to recover any and all damages caused by the foregoing excessive payments and improper related party transactions, and to compel Powers, Cognate, and Toucan Capital to disgorge the excessive payments and/or benefits received in connection therewith.

**THE PARTIES**

7.      Plaintiff is, and has been at all times since July 2007, the owner of shares of common stock of Northwest Bio.

8.      Defendant Northwest Bio is a Delaware corporation with its principal place of business at 4800 Montgomery Lane, Suite 800, Bethesda, Maryland 20814.   Northwest Bio is a publically traded development stage biotechnology company that develops immunotherapy products to treat cancers through its proprietary batch manufacturing process.  The Company has developed a platform technology, DCVax®, which employs activated dendritic cells to mobilize a patient's own immune system to attack their cancer.   DCVax® is used in several of the Company's product lines including the DCVax®-L line, for surgically-removable solid cancer tumors, and the DCVax®-Direct line, for solid cancer tumors which are inoperable or unable to be surgically removed.  As of February 28, 2015, the Company had 12 full-time employees with some additional manufacturing-related employees in Germany.

9.      Defendant Powers serves as the Company's Chief Executive Officer ("CEO"), President, Principal Financial and Accounting Officer, and Chairperson of the Board.  Powers has served as the Board's Chairperson since May 17, 2007 and as the CEO since June 8, 2011.  Powers is the beneficial owner of a majority of the Company's stock, controls the outcome of all issues that require a stockholder vote, and can control the Company's policies and operations.  Powers has been and continues to be a major shareholder of Northwest Bio.  Since 2004. Powers has owned between 44-86% of the Company.  Powers beneficially owns her Northwest Bio common stock through a complex structure of controlled and/or wholly-owned entities.  As explained in the Company's Schedule 14A filed November 6, 2015 ("2015 Proxy"), Powers' ownership consists

of a number of shares owned individually as well as through the Toucan Entities and Cognate. (2015 Proxy, pp. 8-9).

10.     Defendants Toucan Partners, Toucan General, and Toucan Capital are owned and/or controlled by Powers.  Northwest Bio's 2015 Proxy confirms that Powers possesses "voting and dispositive power over the securities owned by the Toucan entities and [Defendant Cognate]." (2015 Proxy, pp. 8-9).  Toucan Capital's general partner is Toucan General, for which Powers serves as the managing director.  Toucan Partners' managing member is Powers.  Toucan Capital is a Delaware limited partnership.  Toucan General and Toucan Partners are Delaware limited liability companies.  Toucan Partners maintains offices at 4800 Montgomery Lane, Suite 801, Bethesda, Maryland 20814.  Toucan Capital and Toucan General maintain offices at 4800 Montgomery Lane, Suite 800, Bethesda, Maryland 20814.

11.     Defendant Cognate is a fully-integrated contract bioservices organization which provides development and cGMP manufacturing services to institutions and companies that develop cell-based products.  Cognate is an entity beneficially controlled by Northwest Bio's controlling stockholder, President, CEO, and Chairperson Powers.  Defendant Toucan Capital is the principal shareholder of Cognate (not including Cognate's employee pool).  Cognate is a Delaware corporation with its corporate headquarters located at 7513 Connelley Drive, Hanover, Maryland 21076.

12.     Defendant Alton L. Boynton, Ph.D. ("Boynton") co-founded the Company. Boynton has served as the Company's Chief Scientific Officer ("CSO") and as a Director since the Company's inception in 1998.  Boynton has also served as the Company's Chief Operating Officer ("COO") and President.  Boynton previously served as the Company's CEO between June

2007 and June 2011.  As disclosed by the Company in the 2015 Proxy (p. 9), Boynton is not considered independent pursuant to NASDAQ Marketplace Rules.

13.     Defendant Robert A. Farmer ("Farmer") has been a director of the Company since December 2009.  Farmer serves on the Board's Audit Committee and on the Board's Compensation Committee and Nominations Committee.

14.     Defendant Jerry Jasinowski ("Jasinowski") has been a director of the Company since his appointment on April 16, 2012.  Jasinowski serves on the Board's Audit Committee and on the Board's Compensation Committee and Nominations Committee.

15.     Defendant Navid Malik ("Malik") has been a director of the Company since his appointment on April 16, 2012.  Malik serves on the Board's Audit Committee and on the Board's Compensation Committee and Nominations Committee.

16.     All references to the "Board" herein refer to the members of the Board then in office at the time the alleged facts occurred.

17.     Defendants Powers, Boynton, Farmer, Malik and Jasinowski are collectively referred to as the "Director Defendants."

## JURISDICTION AND VENUE

18.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity between Plaintiff and Defendants, and the amount in controversy exceeds $75,000.

19.     This Court has jurisdiction over each Defendant because each defendant is either a corporation that does sufficient business in Maryland, or is an individual who has sufficient minimum contacts with Maryland so as to render the exercise of jurisdiction by the Maryland courts permissible under traditional notions of fair play and substantial justice.  This action is not a collusive one to confer jurisdiction on this Court which it would not otherwise have.

20.     Venue is proper in this Court pursuant to 28 U.S.C § 1391 because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District

## SUBSTANTIVE ALLEGATIONS

### A.     Powers' Control of Northwest Bio and Cognate

21.     Powers is the Company's Chief Executive Officer ("CEO"), President, Principal Financial and Accounting Officer, and Chairperson of the Board.  Powers has served as the Board's Chairperson since May 17, 2007 and as the CEO since June 8, 2011.

22.     From at least 2004, Powers has possessed control over Northwest Bio.  The following chart indicates Powers' stock ownership over the past several years:

| Date | Number of Shares Beneficially Owned | Percentage |
|---|---|---|
| October 27, 2015 | 49,329,300 | 44.88% |
| September 30, 2014 | 39,202,623 | 50.67% |
| February 28, 2014 | 32,812,351 | 50.21% |
| October 31, 2013 | 21,334,324 | 51.35% |
| July 30, 2012 | 120,558,957 | 55.9% |
| April 9, 2012 | 110,720,111 | 56.11% |
| March 31, 2011 | 48,812,559 | 44.7% |
| July 20, 2009 | 52,872,326 | 69.5% |
| April 13, 2009 | 65,279,856 | 69.7% |
| April 21, 2008 | 52,739,826 | 72% |

| December 5, 2007 | 52,762,495 | 72% |
| April 19, 2007 | 360,674,520* | 84.7% |
| April 20, 2006 | 394,602,241* | 86% |

* – Beneficial ownership of shares by Toucan Capital Fund II, L.P. and/or associated entities.  Toucan Capital Fund II, L.P., which is currently dissolved, was managed by Powers from 2001 through 2010.

23.      Powers has a significant ownership stake in Northwest Bio and has the ability to exert control over its operations beyond her executive roles through her beneficial control of the Company and her ownership, management and director roles.  The Company has repeatedly admitted as much: since at least April 15, 2004, the Company has stated in each of its annual reports filed with the SEC (Form 10-K) indicating that Powers (through her various entities and affiliates) "[has] the ability to exert substantial influence over all matters requiring approval by [the Company's] stockholders . . . ."

**B.      *Northwest Bio's Related-Party Transactions with the Toucan Entities***

24.      Predating the Company's transactions with Cognate (discussed below), Powers was benefitting personally from a number of transactions between the Company and a group of controlled and/or wholly-owned entities referred to as the "Toucan Entities."  The Toucan Entities include the vehicles through which Powers beneficially owns her Northwest Bio common stock (*i.e.*, Toucan Capital and Toucan Partners, LLC) as well as a number of other related entities and/or affiliates (*i.e.*, Toucan Management, LLC, Toucan General II, LLC, and Toucan Capital Fund II, L.P.).  Generally, the Toucan Entities are venture capital entities controlled by Powers, which have provided substantial amounts of financing to fund the Company's operations since 2004.  As a result of these financing transactions with the Toucan Entities, Powers has gained and maintained a significant ownership and control stake in the Company.

8

25.     Beginning in 2002, the Company faced significant financial distress when the Company realized that it did not have sufficient working capital to adequately fund its operations.

26.     In light of this lack of funding, the Company had to withdraw an investigation drug application and leave open its Phase II clinical trial for brain cancer while simultaneously exploring strategic and additional financing opportunities.

27.     The Company's financing efforts came to fruition beginning in February 2004 when the Company began a significant recapitalization through a series of private placements to the Toucan Entities, despite the availability of financing arrangements from unrelated third parties on better terms.

28.     These financings and capital raising transactions between the Toucan Entities and the Company between February 2004 and May 25, 2007 included the issuance of convertible promissory notes, preferred stock, and warrants in exchange for approximately $12.8 million in capital.

29.     Subsequent to these initial recapitalization transactions, the Toucan Entities continued to provide financing and additional support to the Company, including, but not limited to, subleasing the Company space for its headquarters, paying certain expenses on behalf of the Company, providing short-term loans, and providing an equity facility.

30.     The Company continued to enter into agreements and conduct multiple transactions with Toucan Entities between 2008 and 2012.  These transactions with the Toucan Entities included loans, conversions of the Company's debt into equity, and the formation of an equity facility. Some of the representative transactions  which occurred during this timeframe include:

     a.     On December 22, 2008, Toucan Partners loaned $500,000 to the Company with a term of six months at 12% interest. Additionally, in conjunction with the loan, the Company issued Toucan Partners warrants to purchase shares of the Company's common stock;

b.  On August 19, 2008, Toucan Partners loaned $1.0 million to the Company. On September 28, 2009, the $1,156,718 balance due under the loan was converted to 361,474[1] shares of the Company's common stock using a conversion rate of $3.20 per share. The Company's closing stock price on the date of the conversion was $12;

c.  On July 2, 2010, the Company entered into a securities purchase agreement whereby Toucan Partners purchased 54,167 shares of the Company's common stock for $650,000 and issued warrants to the Company to purchase an additional 86,667 shares at an exercise price of $12. The Company's closing stock price on the date of the conversion was $10.88. Just 5 days later, the stock closed at $21.60;

d.  On October 1, 2010, the Company received a $900,000 convertible loan from Toucan Partners to repay a portion of an outstanding loan payable to a third party. Under the terms of the agreement, Toucan Partners could convert the principal into shares of the Company's common stock at $12 per share. As part of the agreement, Toucan Partners also received 100% warrant coverage with an exercise price of $13.12. The Company's closing price on the date of the agreement was $12.48;

e.  In March 2011, the Company issued a convertible note to Toucan Partners in exchange for $500,000. The conversion price of the note was approximately 80% of the average closing price of Northwest Bio's stock for the 25-day preceding the conversion. In October 2011, the note was converted into just over 125,000 shares of common stock;

f.  On June 2, 2011, the Company entered into an agreement with Toucan Partners to create an equity facility pursuant to which the Company would issue registered shares of the Company's common stock to provide potential financing of up to $25 million over a 30-month period (the "Credit Facility"). The Credit Facility obligated Toucan Partners to purchase shares of the Company's stock upon a sales notice issued to Toucan Partners at a price equal to 95% of the three lowest closing bid prices of the Company's common stock during the fifteen trading days prior to the date of the notification to Toucan Partners. Additionally, the Company was obligated to pay all expenses related to the equity facility and pay Toucan a 1% commitment fee upon the execution of the Credit Facility agreement and a 5% fee on the sales of all shares under the facility;

---

[1] On September 26, 2012, Northwest Bio issued a 1 for 16 reverse split, meaning for each 16 shares of Northwest Bio stock owned pre-split, the shareholder now owned 1 share. For example, a 1,000 share position pre-split became a 62.5 share position following the split. For consistency and ease, all share amounts, stock prices, and conversion prices in the Complaint have been converted to reflect post-split prices and amounts.

g.     On November 1, 2011, Toucan Partners converted $150,000 of a note payable into a 46,875 shares of the Company's common stock. This is a conversion rate of $3.20 per share. The Company's closing price on the date of conversion was $8.00;

h.     On December 29, 2011, Northwest Bio entered into a convertible loan agreement with Toucan Partners for an amount of $100,000 and issued warrants to purchase 15,625 shares of Northwest Bio common stock at $6.40 per share. The Company's closing price on the date of the agreement was $6.08 per share;

i.     On January 3, 2012, Northwest Bio entered into a convertible loan agreement with Toucan Partners for an amount of $80,000 and issued warrants to purchase 25,000 shares of Northwest Bio common stock at $3.20 per share. The Company's closing price on the date of the agreement was $6.40;

j.     On January 31, 2012, Northwest Bio entered into a convertible loan agreement with Toucan Partners for an amount of $425,000 and issued warrants to purchase 132,813 shares of Northwest Bio common stock at $3.20 per share. The Company's closing price on the date of the agreement was $5.92;

k.     On February 9, 2012, Northwest Bio entered into a convertible loan agreement with Toucan Partners for an amount of $1,500,000 and issued warrants to purchase 468,750 shares of Northwest Bio common stock at $3.20 per share. The Company's closing price on the date of the agreement was $5.76;

l.     On March 2, 2012, Northwest Bio entered into a convertible loan agreement with Toucan Partners for an amount of $250,000 and issued warrants to purchase 78,125 shares of Northwest Bio common stock at $3.20 per share. The Company's closing price on the date of the agreement was $5.12;

m.     On March 6, 2012, Northwest Bio entered into a convertible loan agreement with Toucan Partners for an amount of $500,000 and issued warrants to purchase 78,125 shares of Northwest Bio common stock at $6.40 per share. The Company's closing price on the date of the agreement was $5.12;

n.     On October 16, 2012, Northwest Bio converted approximately $10.7 million of Toucan Partners' convertible notes and payables into 3.6 million shares of restricted common stock and 1.8 million warrants with an exercise price of $3.20 per share. The excess $1.9 million Toucan received in the conversion was recorded as a conversion inducement expense. The Company's closing price on the date of the agreement was $6.10; and

o.     In November 2012, Northwest Bio decided to reimburse the Toucan Entities for $4.6 million in the form of Company stock for operation expenses previously incurred. The reimbursement totaled approximately 1.7 million shares of common stock and 800,000 warrants. According to the Company's 10-Q filed on November 14, 2012, the Company recognized the fair value of the common stock and warrants, to the extent that they were in excess of the $4.6 million of

accrued expenses, as a charge to operations.  The Company recorded a charge of $7.346 million to general and administrative operation expenses for the third quarter of 2012.

31.      These transactions were on terms favorable to the Toucan Entities and on terms less favorable to the Company than terms available from other, non-related third parties.

32.      During this time, the Company was dominated by Powers and the relevant Toucan Entities both at the Board level and at the stockholder level.

33.      In fact, the Company disclosed in its Form 10-K filed with the SEC on April 13, 2012, as part of its *Management's Report on Internal Controls Over Financial Reporting*, that one of the material weaknesses identified by management was the:

> Lack of a sufficient number of independent directors for our board and audit committee. We currently only have one independent director on our board, which is comprised of three directors, and on our audit committee. Although we are considered a controlled company, whereby a group holds more than 50% of the voting power, and as such are not required to have a majority of our board of directors be independent.

34.      Towards the end of 2012, the frequency of the financing transactions between the Company and the Toucan Entities began to slow.  However, this slowing was not due to a change in conduct on the part of Powers.  Rather, Powers began to give preference to the manufacturing agreements between the Company and Cognate as the primary vehicle for protecting her ownership and control stake in the Company.

## C.    *Northwest Bio's Related-Party Transactions with Cognate*

35.      Since July 2004, Cognate has been providing manufacturing and other services to the Company related to its DCVax® products and has received substantial payments in the form of the Company's common stock for such services.  These payments in common stock have allowed Powers to maintain her ownership and control over the Company to the detriment of the minority stockholders.

The Prior Service Agreements

36.     On July 30, 2004, the Company entered into the first of these agreements, a two-year services contract with Cognate for, among other things, the manufacturing of the Company's DCVax® product candidates, research, and regulatory advice ("2004 Services Agreement").

37.     On May 17, 2007, the Company entered into the second of these services agreement with Cognate for consulting and manufacturing services concerning the Company's DCVax®-Brain Phase II clinical trial ("2007 Services Agreement").

38.     On the same day the Company entered into the 2007 Services Agreement, Powers was appointed as the Chairperson of the Board.

39.     Nearly four years later, on April 1, 2011, the Company entered into another services agreement with Cognate for manufacturing, storage, and shipping services related to the Company's DCVax® products (the "2011 Services Agreement").

40.     Under each of the agreements, the Company has incurred a substantial amount of expenses.  The Company has disclosed that under the services agreements with Cognate "[d]uring the years ending December 31, 2006, 2007 and 2008, respectively that Northwest Bio recognized approximately $2.4 million, $5.8 million and $7.8 million of research and development costs related to its service agreements."   Furthermore, the Company also disclosed substantial research and development costs under the 2011 Services Agreement amounting to approximately $16.5 million in 2012 and $24.5 million in 2013.  These amounts appear to be above market price and favorable to Cognate and Powers.

41.     In addition to the Prior Service Agreements, even though the Company had the ability to raise money to pay cash, the Company began to convert Cognate's outstanding debt into equity, offering conversion rates that were substantially lower than the market price per share of Northwest Bio's stock.

The 2011 Conversion Agreement

42.     On November 25, 2011, Northwest Bio agreed to convert $9.8 million of debt owed to Cognate into 2.875 million shares of the Company's common stock (the "2011 Conversion Agreement") at a rate of $3.36 per share.  Northwest Bio's stock price on November 25, 2011 was $5.76 per share.

The 2012 Conversion Agreement

43.     On October 16, 2012, Northwest Bio agreed yet again to convert another $7.5 million of debt owed to Cognate into 2.8 million shares of the Company's common stock and 1.4 million warrants (the "2012 Conversion Agreement"). The 2012 Conversion agreement resulted in a conversion rate of $3.20.  Northwest Bio's stock price on October 16, 2012 was $6.10 per share, almost twice the conversion rate enjoyed by Cognate.  Northwest Bio filed a registration statement with the SEC on December 10, 2012 with warrants priced at $5.00.  According to the Company's 10-K, the difference between the fair value of the shares of common stock and warrants issued in excess of the carrying amount of the liabilities amounted to $3.1 million.

The 2013 Conversion Agreement

44.     On July 30, 2013, Northwest Bio agreed to convert $11.6 million of Cognate's accounts payable into 2.9 million shares of the Company's common stock at conversion rate of $4.00 per share ("2013 Conversion Agreement").  Pursuant to the 2013 Conversion Agreement, the Company and Cognate further agreed that starting in August 2013 that the Company would pay in perpetuity at least half of all invoices due to Cognate in shares of the Company's common stock at a conversion price of $4.00 per share until the agreement was terminated by mutual agreement. On July 30, 2013, the Company's closing stock price was $7.36.

14

45.     Cognate was also compensated for agreeing to a lock up provision in the 2013 Conversion Agreement preventing Cognate from selling any conversion shares to a party other than an affiliate for a period of eighteen (18) months.

46.     Additionally, to protect the Powers' interests during the effective time of the agreement, the 2013 Conversion Agreement contains an anti-dilution provision, referred to as a "most favored nation provision", where Cognate (and, in turn, Powers) will receive terms at least as favorable as provided to any other investor or creditor, including with respect to any warrants.

47.     In addition to the unfair conversion terms stated, Powers caused Northwest Bio to engage in a number of other related party transactions with Cognate.

<u>The Cognate Agreements</u>

48.     According to the Board minutes provided through the 220 Demand, following the conversion of all outstanding debts with Cognate into equity, the Board continued to search for additional sources of financing, the Board began deliberations for new agreements with Cognate.

49.     On January 17, 2014, the Company entered into the most recent agreements with Cognate for the manufacture of the Company's DCVax® products and other related services. These agreements consist of: (i) the DCVax®-L Manufacturing and Services Agreement; (ii) the DCVax®-Direct Manufacturing and Services Agreement; (iii) the Ancillary Services Agreement; and (iv) the Manufacturing Expansion Services Agreement (collectively, the "Cognate Agreements").

50.     The terms of each of the Cognate Agreements run to the later of (i) seven years from January 17, 2014 or (ii) five years after the first commercial sales of the DCVax® products being developed under the respective agreements pursuant to marketing authorization or biologics license, unless terminated earlier.

51.     The Cognate Agreements contain very favorable terms to Cognate and, as such to Powers, including, but not limited to:

a.      The Company will pay all invoices for services performed by Cognate during the first 18 month of the agreements at least half in common stock at a conversion rate of $ 4.00 per share (with 50% warrant coverage) with the remainder of the balance to be paid in cash (the closing price of Northwest Bio stock on January 16, 2014 was $4.27 per share);

b.      A 30-month lock-up period on shares which Cognate receives as part of the milestone and initiation payments and the invoice conversions pursuant to in the Cognate Agreements whereby Cognate will receive 15% warrant coverage for each six-month period these shares are subject to a lock-up ("Lock-Up Agreement");

c.      The payment of:

i.      1,020,273 shares of the Company's common stock and a warrant exercisable for 486,802 shares exercisable at $4.00 within five years from issuance and including a cashless exercise provision pursuant to the DCVax®-L Manufacturing and Services Agreement (the "DCVax®-L Manufacturing Initiation Payment");

ii.     1,683,541 shares of the Company's common stock and a warrant exercisable for 803,224 shares exercisable at $4.00 within five years from issuance and including a cashless exercise provision pursuant to the DCVax®-Direct Manufacturing and Services Agreement (the "DCVax®-Direct Manufacturing Initiation Payment");

iii.    1,326,355 shares of the Company's common stock and a warrant exercisable for 632,843 shares exercisable at $4.00 within five years from issuance and including a cashless exercise provision pursuant to the Ancillary Services Agreement (the "Ancillary Initiation Payment"); and

iv.     1,071,287 shares of the Company's common stock and a warrant exercisable for 511,142 shares exercisable at $4.00 within five years from issuance and including a cashless exercise provision pursuant to the Manufacturing Expansion Services Agreement (the "Manufacturing Expansion Initiation Payment") (collectively, with the DCVax®-L Manufacturing Initiation Payment, DCVax®-Direct Manufacturing Initiation Payment, and the Ancillary Initiation Payment, the "Initiation Payments");

d.      Sections 2.7 of each of the agreements that make up the Cognate Agreements state that the Company "will also make milestone payments to Cognate upon

16

the achievement of mutually agreed operational milestones . . . ." (the "Milestone Payments").  When and in which amount these Milestone Payments will be made is unknown as the Company has yet to disclose this information and has taken affirmative steps to not disclose this information by redacting this information from the Cognate Agreements filed by the Company with SEC;

e.     The shares and warrants paid to Cognate pursuant to the Cognate Agreements, including the Milestone and Initiation payments, are subject to a most favored nation provision whereby the terms of the agreements with Cognate will be adjusted so that the terms concerning the shares, warrants, and other securities that are issued or issuable under the Cognate Agreements will be no less favorable to Cognate than the terms provided to other creditors or investors during the term of the Cognate Agreements and/or the Lock-Up Agreement; and

f.     "Piggyback" registration rights to all common shares and shares underlying warrants paid under the Cognate Agreements and all shares and securities owned by Cognate and its affiliates.

52.     These agreements provide that for at least the next 7 years, regardless of the stock price, Cognate will be paid at least half in stock at a conversion rate of $4.00 per share.  As discussed in detail below in Section D, the Cognate Agreements contain further terms that are unfairly beneficial to Cognate at the expense of the Company.

## The Cognate Sale

53.     Northwest Bio engaged in yet another transaction with Cognate following the Cognate Agreements. On June 30, 2014, the Company sold 562,500 shares and 281,500 warrants to Cognate for $2.3 million (the "Cognate Sale").  Not accounting for the value of the warrants, the Company sold each share for $4.08.  Northwest Bio stock closed at $6.76 per share on June 27, 2014 (the last full trading day preceding the Cognate Sale), meaning that the Cognate Sale was at an approximate 40% discount to the market price.  Moreover, the terms of the sale were drastically different than those provided in Northwest Bio's offering on April 11, 2014 (the "April 2014 Offering"), where Northwest Bio sold over 2.2 million shares at $6.60 per share, a 3%

premium to the then-current market price of Northwest Bio stock.  Powers' Use of Northwest Bio Stock through Cognate.

Powers' Use of Northwest Bio Stock through Cognate

54.    A July 9, 2015 article on TheStreet.com sheds light on the way Powers undercuts Northwest Bio stock to the detriment of the Company.  The article comes after Defendant Powers filed a Form 4 on July 2, 2015 in her capacity as a Cognate director.  The article provides yet another example of Powers using Northwest Bio stock to filter money into Cognate.  According to the article, the amount the undisclosed investors made on their loans is staggering.  It states in relevant part:

> BETHESDA, Md. (TheStreet) -- Northwest Biotherapeutics (NWBO) CEO Linda Powers is selling company stock at large discounts to repay loans made to an affiliated, privately held company she controls.

> Some of the money private investors loaned to Powers' private company, Cognate BioServices, was used to pay for Northwest Bio programs. The loans were later repaid by Cognate with Northwest Bio stock priced significantly below market value, allowing the investors to double their money in one year, according to a new filing with the Securities and Exchange Commission.

> Cognate is the cellular processing firm majority owned by Powers through a venture capital firm. She is also chairperson, CEO, principal financial officer and largest shareholder of Northwest Bio, which pays Cognate to manufacture its experimental cancer vaccines and perform other research and development duties.

> The unusual structure of the loans negotiated by Powers does not violate securities laws. Lending money to Cognate, however, allowed the investors to receive more generous repayment terms with less disclosure than if they had dealt directly with Northwest Bio, where some of their money ended up anyway. And the discounted Northwest Bio stock used by Powers to repay the Cognate loans undermined the market value of the stock held by other investors.

> Independent auditors have previously warned investors about problems with Northwest Bio's internal auditing and financial reporting procedures. Among many "material weaknesses" of the company, auditors cited related party transactions Powers negotiates with herself as both the company's CEO and as the majority owner of Cognate, according to Northwest Bio's most recent annual report filed in March.

18

Now comes new details about financial deals in which Powers' Cognate acts as a de facto cash-transfer agent between unidentified investors and Northwest Bio. The loans were disclosed in an SEC Form 4 filed July 2 by Powers in her role as a Cognate director.

**In June and July 2014, an investor lent Cognate $5 million, structured as two convertible loans of $2.5 million apiece. The $5 million lent by the investor to Cognate was passed through to fund Northwest Bio programs. One year later, on June 30, 2015, Cognate repaid the loans. Instead of cash, the investor received 1,118,092 shares of Northwest Bio stock owned by Cognate, according to the SEC filing.**

**On the day of the loan conversion, Northwest Bio shares closed $9.93, which valued the shares received by the investor at more than $11.1 million. The shares are freely tradable.**
**The same SEC filing also documents a separate convertible debt deal in which an investor lent Cognate $3 million, later repaid with Northwest Bio stock owned by Cognate valued at $6.4 million.**

**In total, $8 million in loans to Cognate were repaid with Northwest Biotherapeutics stock valued at more than $17 million.**

The investor(s) who received the generous repayment terms on their loans are not identified in the SEC filing and Northwest Bio did not respond to questions about the financings.

The identity of the investors is important because proceeds of two of the Cognate loans negotiated by Powers were funneled to Northwest Bio programs. The repayment terms of the loans also show **Powers negotiating financing deals that undercut the value of Northwest Bio shares**, while providing the investors with a 100%-plus return on their initial investment. This may have been Powers' only or best way to raise money for Northwest Bio programs at that time, but the company hasn't explained why.

The two convertible loans totaling $5 million that were repaid with 1.1 million shares of Northwest Bio stock sets the effective conversion rate -- when negotiated in June and July 2014 -- at $4.47 per share.

But during that two-month period, Northwest Bio stock traded at a low of $5.71 per share and a high of $7.66 per share.

In effect, Powers, using Cognate as a middleman, raised $5 million for Northwest Bio at a 20%-40% discount to its stock price at that time. **Whether or not proceeds from the separate $3 million convertible loan were also passed through to Northwest Bio was not disclosed in the SEC filing.**

Only by using Cognate as the financing vehicle -- and not dealing directly with Northwest Bio -- was the investor able to secure the generous repayment terms. **Had the investor negotiated directly with Northwest Bio, the conversion price on any convertible loan would have been set at a premium to the current value of the stock** -- standard practice for such financings dictated by the fiduciary responsibilities to current shareholders.

As of June 30, Cognate held 18.4 million shares of Northwest Bio plus another 10.4 million shares underlying warrants currently exercisable, according to SEC filings. When Cognate performs work for Northwest Bio, payment is made with a mix of cash and stock.

In 2014, Northwest Bio paid Cognate $18.7 million in cash and another $21.3 million in stock-based compensation for work performed -- almost half the company's total R&D expenses for the year, according to related-party transactions disclosed in Northwest Bio's annual report filed with the SEC.

The Northwest Bio shares used to compensate Cognate are set a fixed price of $4 -- a large discount to the prevailing market price.

(Emphasis added).

55.     The article indicates that Powers could have negotiated better terms for Northwest Bio by going directly to the investor and circumventing Cognate.   Additionally, there is no evidence whether Cognate transferred the loan to Northwest Bio or if it kept a portion for itself. This is another example of Powers acting through Cognate at the expense of the Company.

<u>The Cognate Notes</u>

56.     On October 22, 2015, Cognate loaned the Company $1 million pursuant to a Demand Promissory Note (the "Cognate Note").  The Cognate Note bears interest at the rate of 8% per annum, and will be payable upon demand, with 7 days' prior written notice by Cognate to the Company. The Cognate Note also bears (i) 35% warrant coverage on the principal amount and interest amount (collectively, the "Repayment Amount"), if the Cognate Note is repaid in full on or before the expiration of 30 calendar days following the date hereof and (ii) 100% warrant

coverage on the Repayment Amount, if the Cognate Note is not repaid in full within 31 calendar days of the date hereof.

57.     Cognate also loaned the Company $2.25 million in June 2014.  On June 30, 2014, the Company converted all $2.25 million in exchange for 562,500 shares and 281,500 warrants at an exercise price of $4.00.  Northwest Bio stock closed at $6.76 per share on June 27, 2014 (the last full trading day preceding the conversion), meaning that the conversion was at an approximate 40% discount to the market price.  Moreover, the terms of the conversion were drastically different than those provided in Northwest Bio's offering on April 11, 2014 (the "April 2014 Offering"), where Northwest Bio sold over 2.2 million shares at $6.60 per share, a 3% premium to the then-current market price of Northwest Bio stock.

**D.      The Terms of the Company's Agreements with Cognate Unfairly Benefit Cognate and Powers to the Detriment of the Company**

58.     The terms of the Cognate Agreements, summarized above, evidence a negotiation process by which Powers was able to enrich herself at the expense of the Company.  These terms, which include the initiation payments, the milestone payments, the lockup and piggyback provisions, and the below market conversion rate and warrants would not have been agreed to but for Powers control over the Company and the purportedly independent directors approving the transactions.

The Initiation Payments

59.     The Initiation Payments, payable under the Cognate Agreements, served as an instant way for Powers to shore up her ownership and control over the Company upon the execution of the Cognate Agreements.

60.     The Initiation Payments purportedly compensated Cognate for: (i) its "extraordinary performance to date"; and (ii) continuing to provide services under expired

21

agreements, for which Cognate invoiced the Company despite the expiration of the contract. Furthermore, the Initiation Payments were purportedly made to compensate Cognate for all the additional "undertakings" that Cognate would be invoicing under the Cognate Agreements and Cognate's preparation for providing those services.  Despite the fact that almost the entirety of all of Cognate's expenses were to be paid by Northwest Bio, the directors reviewing the Cognate Agreements approved these payments.

The Milestone Payments

61.     Sections 2.7 of each of the Cognate Agreements state that the Company "will also make milestone payments to Cognate upon the achievement of mutually agreed operational milestones . . . ."  Based on this language, it would appear that the issuance of these valuable milestone payments are dependent upon future agreements between Cognate (controlled by Powers) and the Company (controlled by Powers).  In other words, without any predefined conditions, Powers can pick and choose when it receives the Milestone Payments.

62.     As a result, Powers has the ability to cause Northwest Bio to issue the Company's common stock and warrants to Cognate (and herself) for the purpose of offsetting any grants of stock to non-related parties which, depending on the size and amount, may threaten Powers majority interest.

The Lock-Up Agreement and the "Piggyback" Registration Rights

63.     Pursuant to Section 7.2 of each of the agreements making up the Cognate Agreements, the Company has provided "piggy-back" registration rights. Sections 7.2 of the Cognate Agreements state that:

64.     Cognate will be entitled to "piggyback" registration rights, with respect to all unregistered conversion shares issued hereunder and all other shares and securities of NW Bio

22

owned by Cognate and its affiliates, in any registrations effected by NW Bio until all such shares and securities have been registered. NW Bio will use commercially reasonable efforts to complete registration of such unregistered conversion shares by the earlier of six (6) months after the Effective Date of this Agreement or six (6) months after issuance during the Term of this Agreement.

65.     This "piggyback" provision not only provides substantial benefit to Cognate, but also provides a direct and significant benefit to Cognate's "affiliates."  Cognate's "affiliates" include the Toucan Entities and Powers, and therefore the provision applies to the restricted securities owned by them.

66.     Furthermore, pursuant to the Cognate Agreements, Cognate is receiving shares that the Company is obligated to register and that are subject to a Lock-Up Agreement.  As compensation for agreeing to the lock-up provision, Cognate will receive 15% warrant coverage for each six-month period these shares are subject the lock-up.

<u>The Conversion Rate and Warrants</u>

67.     For at least seven years, the Cognate Agreements require the Company to issue Northwest Bio stock and warrants to Cognate at a discounted price of $4.00, however, Northwest Bio's stock price closed at $4.27 per share on the day before the Company entered into the Cognate Agreements.  The $4.00 per share conversion rate represents an approximate 6.3% discount in favor of Cognate based on the Company's closing stock price of $4.27 on the last full trading day before the Cognate Agreements were executed.  The Cognate Agreements contain no provisions for any future review based on the stock price.

68.     In addition to the issuance of shares, Cognate has received and is slated to receive additional warrants with a $4.00 exercise price pursuant to the Cognate Agreements.  As soon as

the Company entered into the Cognate Agreements, the Company was contractually bound to issue these in-the-money warrants to Cognate.  The Company is obligated to issue a vast amount of warrants to Cognate under the Cognate Agreements including: (i) the 50% warrant coverage on the shares received as a result of converting certain of Cognate's invoices into shares of the Company's common stock; (ii) warrants issued as part of the initiation payments and milestone payments (discussed above); and (iii) the 15% warrant coverage to be issued every six months for the shares Cognate receives that are subject to the Lock-Up Agreement.

69.     Since the Company entered into the Cognate Agreements, the Company's stock price has traded as high as $12 on July 28, 2015, and only briefly went below the $4.27 low on the date the Cognate Agreements were entered.  Thus, Cognate has received shares and warrants with values significantly greater than the fair market value of these shares and/or the value of the services invoiced.  Through the various conversions and the Cognate Agreements, Cognate will continue to receive additional shares for its services that it would not otherwise be entitled to if the conversion rate or warrant exercise price was automatically or periodically adjusted in line with the Company's common stock prices.

70.     From July 31, 2013 through September 30, 2014, pursuant to the terms of the 2013 Conversion Agreement and the Cognate Agreements, the Company issued to Cognate an aggregate of 8,907,750 shares and warrants to purchase 4,582,176 shares.  (2015 Proxy, p. 17.)  Under the 2013 Conversion Agreement, for the nine-month period ending September 30, 2014 alone, Northwest Bio issued 4.2 million shares of common stock to Cognate (the fair value of which was approximately $25.2 million) and 2.2 million warrants (valued at $7.3 million).  The Company recorded a $16 million "inducement expense" in connection with these issuances (presumably due to the fact that the shares and warrants were issued at a 30% discount to the then-current market

price).  (Northwest Bio Form 10-Q, filed Nov. 19, 2014, p. 17.).  On November 12, 2014, the

Board approved the issuance of 8,052,092 shares of common stock to Cognate for services and

most favored nation provisions in accordance with the Cognate agreements. (2015 Proxy, p. 17.

71.     Separate and apart from the advantageous conversion rate, the Cognate Agreements

benefit Cognate by providing for the shifting of manufacturing expansion costs, early termination

fees, and the most favored nation provisions.  Collectively, these terms evidence the unfair nature

of these agreements and are indicative of an inadequate and less than arm's length negotiation

process.

**E.     *A Comparison of Financing Arrangements with Parties Other than Cognate Demonstrates the Lack of Arm's Length Negotiations with Cognate Transactions***

72.     The inadequate negotiation process between Cognate and Northwest Bio becomes

all the more evident when compared with the Northwest Bio's alternate financing arrangement at

or around the time of the Cognate Agreements.  First, for example, the Company completed a

public offering on November 25, 2013, wherein Northwest Bio sold approximately 5 million

"units" at a price of $4.80 per "unit" (the "2013 Offering").  Each "unit" sold consisted of one

share of the Company's common stock and a warrant to purchase 0.5 shares of common stock with

an exercise price of $6.00 per share and an expiration date of five years from issuance.

73.     Under the Cognate Agreements, however, the conversion price is $4.00 per share

plus an additional 50% warrant coverage (with the warrants being issued at a $4.00 exercise price

with a five-year expiration), at a time when the Company's stock was trading at $4.55 per share

on January 17, 2014.  Thus, Cognate's terms were substantially better than what it would have

received if it was a non-related party—it was able to receive stock and warrants that were already

in-the-money when they were issued, and that have only increased in value as the Company's stock

has traded well above the market price when the Cognate Agreements were entered into.

25

74.     Another example illustrating the unfairness of the Cognate Agreements is the April 2014 Offering.  In the April 2014 Offering, the Company filed a prospectus supplement on Form 424B5 with the SEC announcing an offering to a single existing institutional investor of 2,272,727 shares of common stock at $6.60 per share with an overallotment right to purchase an additional 2,272,727 shares of common stock at $7.50 per share within one year.  As part of the Securities Purchase Agreement entered into between the Company and this institutional investor, the Company retained H.C. Wainwright as the sole placement agent.  For this role, H.C. Wainwright would receive fees comprising of 7% of the gross offering proceeds and warrants equal to 5% of the shares sold to the investor.  The warrants issued to H.C. Wainwright with respect to first offering had an exercise price of $8.25, or 125% of the offering price; the warrants issued with respect to the overallotment right had an exercise price of $9.375, or 125% of the overallotment price.  All warrants had an expiration date of February 5, 2018.

75.     The terms provided to Cognate under the Cognate Agreements are substantially less favorable for the Company than those under the April 2014 Offering.  First, the Company's common stock in the April 2014 Offering was priced at $6.60 per share which equates to approximately a 3.7% discount to the $6.85 closing price of the Company's stock the last full trading day before the filing of the April 2014 Offering's Form 424B5—the discount given to Cognate in the Cognate Agreements was 6.3%, almost twice as much.  Furthermore, the warrants to be issued to H.C. Wainwright for its services in the initial offering had a four-year exercise period and were $1.38 out-of-the-money (based on the Company's closing stock price on April 8, 2014, the last full day of trading before H.C. Wainwright and the Company entered into the placement agreement).  Cognate, however, received warrants at just $0.27 out-of-the-money (based upon the Company's closing stock price on the last full trading day before the Cognate

Agreements were executed) as well as an extra year to exercise them (a five-year exercise period). Thus, Cognate again received more beneficial terms under the Cognate Agreements than obtained by the non-related parties.

76.     Another example illustrating the unfair benefits received by Cognate can be found in the Company's debt issuance on August 19, 2014 (the "2014 Debt Issuance").  In the 2014 Debt Issuance, the Company issued $17.5 million in 5.00% Convertible Senior Notes with a maturity date of August 15, 2017.  The notes issued by the Company pursuant to the 2014 Debt Issuance (the "Notes") were convertible into the shares of the Company's common stock based on certain milestones.  The Notes had an initial $7.30 conversion price (subject to adjustment), and the Company's common stock closed at $6.58 on August 18, 2014, the last full trading day before the issuance of the Notes.  Thus, the $7.30 initial conversion price of the Notes was approximately 10.9% higher than the Company's closing stock price on the last full trading day before the issuance of the Notes.  This is in stark contrast to the $4.00 exercise price of the warrants issued pursuant to the Cognate Agreements, which were priced in-the-money at the time the Cognate Agreements were executed.

77.     Yet another example illustrating the preferential treatment given to Cognate occurred on October 6, 2014, during a stock offering with a private institutional investor (the "October 2014 Offering").   In the October 2014 Offering, the Company entered into stock purchase agreement with an existing institutional investor for the sale of 2,272,727 shares of common stock at a price of $5.05 per share.  The October 2014 Offering closed on October 9, 2014, at which time Northwest Bio's stock closed for the day at $4.01 per share.  As part of the October 2014 Offering, the Company cancelled an existing over-allotment right (from a previous offering) in lieu of issuing a warrant to purchase approximately 2.7 million shares at the price of

27

$5.15 with an exercise period of 30 months.  Again, this offering is in stark contrast to the terms granted to Cognate, which was issued stock and warrants that were in-the-money, rather than here, where the shares were priced well above the market rate.

78.     An additional transaction that illustrates the unfair process behind the Cognate Agreements relates to the Company's November 17, 2014 private offering (the "November 2014 Offering").  In the November 2014 Offering, the Company issued $25 million of the Company's unregistered common stock at a price of $5.79 per share, which was the closing price of the stock on November 14, 2014 (the last trading prior to the sale of the shares).  The November 2014 Offering did not include any warrants, overallotment rights, or pre-emptive rights.  The pricing of this offering to a non-related party occurred at the market price on the day before the agreement was made.  Furthermore, the non-related party was receiving unregistered shares with no warrant coverage or any other additional rights.  Again, these terms are in stark contrast to the benefits received by Cognate and Powers pursuant to the Cognate Agreements.

79.     In April 2015, the Company issued $40 million of the Company's unregistered common stock at a price of $7.40 (the "April 2015 Offering"). The stock price closed at $7.86 on the day of the issuance. The April 2015 Offering did not include any warrants, overallotment rights, or pre-emptive rights.  Here, unlike the related party transactions with Cognate and the Toucan Entities, the Company was able to obtain financing near market price.

80.     Most recently, on October 22, 2015, the company issued $30 million of the Company's common stock at $5.50 per share, for a total of 5,454,545 shares (The "October 2015 Offering").  The stock price closed at $4.86 the day of the issuance.  The October 2015 Offering did not include any warrants, overallotment rights, or pre-emptive rights.  Unlike the related party

transactions with Cognate and the Toucan Entities, the Company was able to obtain financing above market rates.

81.     As described above, the Company was able to secure substantially better terms in its agreements with non-related parties, yet failed to do so when transacting with Cognate and the Toucan Entities.

**F.     *Powers Has Benefitted Personally from the Related-Party Transactions***

82.     The Company's transactions with Cognate reveal a pattern whereby Powers has successfully and routinely increased her ownership and control stake to offset any dilution she incurs from outside financing arrangements. For example:

    a.    In April 2013, the Company entered into an agreement with a healthcare-dedicated institutional investor for a registered direct placement of approximately 2.564 million shares.  As part of this transaction, the Company additionally issued to the investor warrants exercisable for 1,025,641 shares of common stock;

    b.    On July 31, 2013, the Company and Cognate agreed to the 2013 Conversion Agreement whereby they agreed to convert an aggregate of $11.6 million in accounts payable into shares of the Company's common stock at a conversion price of $4.00 per share.  This resulted in the issuance in August 2013 and December 2013 of an aggregate of 4.7 million shares;

    c.    On August 8, 2013, the Company entered into a securities purchase agreement with institutional investors for the sale of an aggregate of $15.0 million of units in a registered direct offering.  Each unit consisted of one share of common stock, one long-term warrant to purchase 0.25 of a share of common stock and one over-allotment warrant to purchase 0.25 of a share of common stock. Pursuant to this agreement, the Company issued to the investors 4,477,612 shares of common stock and long-term warrants exercisable for 1,119,403 shares and over-allotment warrants exercisable for 1,119,403 shares of common stock;

    d.    On January 17, 2014, the Company entered into the Cognate Agreements.  In addition to the Milestone Payments and payments for services, the Company was obligated to make the Initiation Payments upon the execution of the Cognate Agreements.

83.     The success of Powers' strategy is evident.   Despite engaging in a number of outside financing transactions and the issuance of shares to unrelated third parties, Powers has been able to maintain her beneficial ownership the Company.  The resulting effect of the Company entering into agreements with Cognate is that Powers is able to maintain and/or increase her ownership stake and control over the Company in order to offset the dilutive effect of conversions and securities offerings with unrelated third parties.  Further, Powers is able to generate revenue for Cognate and herself by negotiating between Northwest Bio and Cognate for terms that are more favorable to Cognate.

### G.     The Board's Review of the Related-Party Transactions Was Not Independent

84.     According to Northwest Bio's filings with the SEC, the Company's Board reviews related-party transactions for "potential conflicts of interests or other improprieties."  For example, Northwest Bio's 2013 Form 10-K states:

> With respect to reviewing and approving related-party transactions, the Board reviews related-party transactions for potential conflicts of interests or other improprieties. Under SEC rules, related-party transactions are those transactions to which we are or may be a party in which the amount involved exceeds the lesser of $120,000 or one percent of the average of our total assets at year end for the last two completed fiscal years, and in which any of our directors or executive officers or any other related person had or will have a direct or indirect material interest, excluding, among other things, compensation arrangements with respect to employment or board membership. Any transactions with officers, directors or 5% stockholders are on market-based terms, and are approved by a majority of our independent and disinterested directors.

85.     Despite the volume and frequency by which the Company does business with related entities, related party transactions are not reviewed by a special committee or other committee of independent directors.  Rather, the Board's review of the related-party transactions is done with the input and occasionally the direct assent of Defendant Powers.  According to documents received pursuant to the 220 Demand, whenever discussions concerning dealings with the Toucan Entities and/or Cognate, Defendant Powers was present for these discussions.  Indeed,

at times the discussions concerning Cognate were directed by Defendant Powers despite her obvious conflict.

86.     The documents provided in connection with the 220 Demand demonstrate the crucial role Defendant Powers played in the negotiations with Cognate.  For example, on January 15, 2012, the Board held a meeting where it discussed the need to obtain financing from any and all sources, including internal sources.  At this meeting the Board openly discussed the "potentially onerous" terms of such financing with Defendant Powers present.  It was only after the Board had these deliberations that Defendant Powers "recused" herself from the vote of the remaining Board members.  The Board minutes do not state that whether Powers physically left the room while the deliberations on the votes were made.  Regardless, she was present for deliberations on matters in which she is unquestionably conflicted.

87.     On August 11, 2013, the Board held two consecutive Board meetings, the first of which was attended by Kelly Ganjei, acting CEO of Cognate, and Mike Stella, Executive Vice President of Global Operations of Cognate.  During the first meeting, the Cognate officers raised issues with the outstanding payments owed to Cognate, and requested that Cognate be compensated for such work by granting preferential terms in the Cognate Agreements to be negotiated.  The full Board, including Defendant Powers, were present for this meeting and agreed to resolve any unpaid amounts owed to Cognate and get new or revised contracts in place for Cognate "to be made whole."

88.     A second Board meeting was held immediately thereafter without the members of Cognate management present.  This Board meeting was attended by the entire Board.  During the meeting, the Board "discussed the seriousness of the situation with Cognate, and the importance

of entering into new or revised contracts with Cognate to cover the expanded scope of services needed from Cognate, both now and going forward."

89.     Additional Board minutes demonstrate that Defendant Powers, while she may not have voted on related party transactions, was involved in the negotiation and decision-making process concerning related-party transactions.  For example, on August 26, 2013, the Board met to discuss the negotiations of the Cognate Agreements.  The Board minutes state, in relevant part:

> The meeting was called to primarily discuss the new agreements with Cognate BioServices, following up on the Board meetings and discussions a couple of weeks earlier ago [sic] the Cognate situation.  During the weeks since those prior Board meetings, the Company and Cognate have negotiated an approach to making Cognate whole for the past as well as entering into new agreements for the expanded services needed by the Company going forward.  The negotiations were led by Les Goldman for the Company, and by Kelly Ganjei for Cognate, ***with input at various points by Linda Powers*** and Mike Stella.
>
> *                *                *
>
> The Board also asked about whether Cognate was satisfied with these agreements, and whether the situation with Cognate had been repaired.
>
> ***Following the long discussion, the Board approved the two new contracts for the DCVax-L and DCVax-Direct programs which had been circulated by Mr. Goldman.  The Board directed Management to get them executed as soon as possible***.

 (Emphasis added).

90.     The August 28, 2013 Board meeting was convened solely to discuss the Cognate Agreements.  During this meeting, Defendant Powers was not only present, but was also providing input as to how the Company should "mak[e] Cognate whole" for past services, and how to structure the new Cognate Agreements.  After providing her input on such matters, the entire Board (including Defendant Powers) directed management to execute the Cognate Agreements as soon as possible.  Thus, Defendant Powers was directly involved in the Board meeting which led to the Cognate Agreements' execution, and played a pivotal role in the structure and terms therein.

91.     Following the August 28, 2013 meeting, the full Board convened another Board meeting on September 1, 2013.  According to the Board minutes, Defendant Powers was present throughout the meeting, which was convened "primarily to discuss the new Cognate manufacturing agreements and a potential opportunity relating to a biologic compound [redacted] for which some assets are being auctioned."  The Board minutes state, in relevant part:

> The Board asked about the status of the Cognate agreements.  In the prior Board meeting, two agreements had been approved by the Board (for DCVax-L and DCVax-Direct manufacturing and related services), and the Board had directed Management to get the agreements executed as quickly as possible as part of repairing the Cognate situation and also providing the capacity needed by the Company going forward.  The Board also expected to receive drafts of the other two planned agreements with Cognate (for ancillary services and for manufacturing capacity expansion).

> [REDACTED]

> ***Ms. Powers and Mr. Goldman reported on the planning for the next financing, which will be the $15-20 million financing in Cognate*** . . . . It is anticipated that financing which goes to Cognate will be made available by Cognate to the Company (on terms to be negotiated).  This will significantly increase the funding available to the Company, beyond what the Company itself is able to come up with. . . .

> The Board re-emphasized its continued strong support for getting new Cognate agreements done as soon as possible.  The Board recognized that they may have to be delayed until the restrictions from the August financing expire, but then it should be a high priority to get them done as soon as possible.

(Emphasis added).

92.     At the same Board meeting, Defendant Powers' conflict of interest was once again highlighted involving an opportunity to potentially acquire some assets of a biologic compound.  Defendant Powers raised this opportunity with the Board, and the minutes reflect the lack of any meaningful distinction between Defendant Powers in her capacity as a director of Northwest Bio and her ownership position with Cognate.  Following a discussion about these assets, the Board minutes state:

> ***Ms. Powers explained that Cognate BioServices is also interested in this opportunity, and willing to pursue it jointly with the Company.***  Cognate has a broader array of programs and operations than does the Company, so the [redacted] compound may have more of a fit for them.  Cognate is willing to share the costs and the pursuit of further information together with the Company . . . . As an initial step, the Company and Cognate propose to submit a joint bid for the assets . . . . [T]he Board approved proceeding on the basis proposed by Management for the time being, subject to being revisited later.

(Emphasis added).

93.    On November 3, 2013, the Board held another meeting where the issue of putting together a financing with Cognate was discussed.   Again, Defendant Powers was present throughout the meeting.  Also during this meeting, Defendant Powers along with Mr. Goldman "emphasized the urgency of completing the 4 new agreements with Cognate."  Following this, the full Board, including Defendant Powers, "directed management to execute the new agreements with Cognate as soon as possible.  The Board reaffirmed that Cognate should be made whole for the delays and for compensation that has not been paid."

94.    The 220 Documents are replete with additional Company Board meetings where Defendant Powers was involved with discussions and deliberations concerning related party transactions with Cognate and Toucan.  Between January 2012 and September 2014, twenty-one out of the twenty-four Board meetings discussed or referenced a related party transaction with Cognate or Toucan.   Even in those instances where Defendant Powers recused herself from a vote, the minutes make no reference to whether Powers actually excused herself from the room.  As the agreements with Cognate and the Toucan Entities constitute related-party transactions with Northwest Bio's controlling stockholder, the Board should have employed a special independent committee to evaluate the transactions.  As a result, the transactions were approved and entered into at the behest of Powers and, as explained above, inured to her personal benefit at the expense of the Company.

## DERIVATIVE AND DEMAND ALLEGATIONS

95.      Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

96.      Plaintiff brings Counts I through III derivatively in the right and for the benefit of the Company to redress: (i) the Director Defendants' breaches of fiduciary duties; (ii) Cognate and Powers aiding and abetting the Director Defendants' breaches of fiduciary duties; and (iii) Cognate's and Powers' unjust enrichment.

97.      Plaintiff is a stockholder of Northwest Bio, was a stockholder of Northwest Bio at the time of the wrongdoing alleged herein, and has been a stockholder of Northwest Bio continuously since that time.

98.      Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

99.      Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

100.      On September 30, 2015, Plaintiff made a demand (the "Demand") on the Board to commence an action against certain directors and executive officers of the Company.

101.      The Demand informed the Board that if it did not respond within 30 days, the Plaintiff would commence a stockholder derivative action on behalf of the Company.

102.      On November 19, 2015, Plaintiff filed her initial complaint against Defendants after the Board failed to respond to the Demand.

103.      On November 24, 2015, after the initial complaint was filed, the Board sent a letter stating the Board intended to consider the Demand.  However, to date, the Board has taken no

substantial action to respond to the Demand.  Accordingly there is no impediment to Plaintiff commencing and prosecuting this action on behalf of the Company.

## COUNT I

### Derivatively Against the Director Defendants for Breach of Fiduciary Duties

104.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

105.     As alleged in detail herein, each of the Director Defendants had a fiduciary duty to, among other things, act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

106.     The Director Defendants breached their fiduciary duties of loyalty and good faith by approving and continuing various agreements between the Company and Cognate complained of herein, which were not, and could not have been, exercises of good faith business judgment. Rather, they were intended to, and did, unduly benefit Defendants Powers, Cognate, and Toucan Capital at the expense of the Company and were not entirely fair to the Company.

107.     As a direct and proximate result of the Director Defendants' breaches of fiduciary duties, the Company has sustained substantial damages, including, but not limited to, the excessive payments and benefits given to Cognate and by virtue of their beneficial ownership of Cognate and Powers.

## COUNT II

### Derivatively Against Powers, Toucan Capital, and Cognate for Aiding and Abetting

108.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

109.     As alleged in detail herein, each of the Director Defendants had a fiduciary duty to, among other things, act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

110.     The Director Defendants breached their fiduciary duties of loyalty and good faith by approving and continuing the agreements between the Company and Cognate complained of herein, which were not, and could not have been, exercises of good faith business judgment. Rather, they were intended to, and did, unduly benefit the Powers, Cognate, and Toucan Capital at the expense of the Company and were not entirely fair to the Company.

111.     As alleged in more detail above, Powers, Cognate, and Toucan Capital aided and abetted the Director Defendants' breaches of fiduciary duties by causing the Board to enter into the agreements with Cognate.

## COUNT III

### Derivatively Against the Powers, Toucan Capital, and Cognate for Unjust Enrichment

112.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

113.     As a direct and proximate result of the Director Defendants' breaches of fiduciary duties, Defendants Cognate and Powers have received excessive and unwarranted payments and benefits as a result of the agreements between the Company and Cognate.

114.     It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for Defendants Cognate and Powers to retain the excessive and unwarranted payments and benefits they have received.

115.     To remedy the alleged unjust enrichment, the Court should compel Powers, Cognate, and Toucan Capital to disgorge to the Company the excessive and unwarranted payments and benefits they have received.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Awarding the Company the amount of damages it sustained as a result of the Director Defendants' breaches of fiduciary duties and Cognate's, Powers', and Toucan Capital's aiding and abetting of those breaches of fiduciary duty;

B.     Compelling Defendants Cognate, Powers, and Toucan Capital to disgorge to the Company the benefits they have received as a result of the related-party transactions;

C.     Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

D.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial.

Dated: January 19, 2015                         **LEVI & KORSINSKY, LLP**

By:  */s/ Nicholas I. Porritt*
                Nicholas I. Porritt (17078)
                1101 30th Street N.W., Suite 115
                Washington, D.C. 20007
                Tel: (202) 524-4290
                Fax: (202) 333-2121
                nporritt@zlk.com

                *Attorney for Plaintiff*